UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JOHN P. ZUMWALT,           )
    Plaintiff              )
                     )    **Case No. 4:10-cv-00561-RWS**
vs.                        )
                     )
CITY OF WENTZVILLE MO, et al.  )
    Defendant.             )

## PLAINTIFF ZUMWALT'S STATEMENT OF MATERIAL FACTS IN DISPUTE AND/OR OMITTED BY DEFENDANTS' STATEMENT OF UNCONTROVERTED MATERIAL FACTS

Comes now Plaintiff, John Zumwalt, by Counsel, and pursuant to Rule 56 FRCP and Local Rule 7-4.01 (e) submits this Statement of Material Facts in Dispute and/or Omitted by Defendants' the City of Wentzville, Missouri, Robert Noonan, and Dianna Wright in response to Defendants' Motion for Summary Judgment (Doc 78) and Memorandum in Support thereof (Doc 79). Further, pursuant to said Local Rule, Plaintiff's Statement of Disputed and/or Omitted Material Facts, shall utilize the numerical format chosen by Defendant's counsel, and will note those controverted material facts at issue[1], together with additional admissible evidence relevant thereto which directly bears on the so-called "uncontroverted" fact by utilizing a letter format on each paragraph for Omitted relevant material facts.

**A. City of Wentzville, Missouri**

1.      Plaintiff admits Chief Robert Noonan is currently employed as Chief of Police for the City of Wentzville and his length of service in that capacity since 1997.

---

[1]  Plaintiff notes that Defendant's counsel has taken statements out of context and/or characterized occurrences in a fashion that lacks a chronological sequence and is objectionable pursuant to Rule 106 FR Evidence since the alleged uncontroverted facts lack context and repeatedly fail to observe the Rule of Completeness.

2.      Plaintiff admits that Ms. Dianna Wright is currently the City Administrator of the City of Wentzville, Missouri and that she had served in that capacity since June, 2008.

3.      Plaintiff admits that Ami Holiway is currently the Human Resources Manager for the City of Wentzville, Missouri and has served in that capacity since 2001.

4.      Plaintiff admits that Ms. Holiway serves at direction of Ms. Wright.

5.      Plaintiff admits that Capt. K. Pyatt is currently the Captain of the City of Wentzville, Missouri Police Department and has served in that capacity since 2002.

6.      Plaintiff admits that Capt. Pyatt's duties include the oversight of the day-to-day activities of the Wentzville P.D and he serves at the direction of Chief Noonan.

7.      Plaintiff admits that Capt. Pyatt also investigates officer-related complaints assigned by the Chief and/or assigns the investigation to the Lieutenant of Support Services; but, in his capacity as Captain with oversight of the day-to-day operations, he assists and/or supervises those investigation as well as conducts them himself at his apparent discretion. (Pyatt TR 11-12)

8.      Plaintiff admits that Lt. David Stewart is currently the Lieutenant of Support Services for the City of Wentzville P.D. and has served in that capacity since July 2008 (not 2004) (Stewart TR 9).

9.      Plaintiff admits that, as the Lieutenant of Support Services., Lt. Stewart's responsibilities include overseeing the traffic division, DARE training, and internal affairs, among other things; but has had limited experience in internal affairs since July 2008 only. (Stewart TR 9)

10.     Plaintiff admits the Lt. Leon Burton is currently a Lieutenant for the City of Wentzville P.D. and has served in that capacity for approximately three (3) years.

A.      Plaintiff notes that the City of Wentzville, Missouri enacted a Policy Manuel to act as an Employee Handbook for all employees of the City and establishes Uniform Personnel Policies and Procedure for the Wentzville municipal government. (SAC ¶ 3; DX-B)

B.      Plaintiff notes that, within the Police Department of the City of Wentzville; the department is managed by the Chief of Police and governed by General Orders issued at his direction to act as a guide for the conduct and procedures of the members of the department regarding those activities falling within the ambit of each general order to be read in conjunction with each other. (Noonan TR 12; 28-30)

C.      Plaintiff notes that G.O 11-02-213 dated May 19, 2009 was issued to enunciated: Administrative Responsibilities and Organization (PX-1)[2]. Further, its supersede G.O 11-02-116 dated February 1, 2004 (PX-2) and summarizes various supervisory and administrative responsibilities and establishes an organizational structure of the Wentzville P.D.

D.      Plaintiff notes that G.O 11-02-206 dated May 23, 2008 was issued to enunciate: General Responsibility and Authority of all members of the Wentzville P.D.( PX-3)

E.      Plaintiff notes that G. O 52-01-212 dated April 8, 2009 was issued to enunciate: Complaint Reporting and Investigation and outlines the responsibilities, authority, polices, and procedures relating to complaints of employee misconduct and internal investigations of the Wentzville P.D. (PX-4).

F.      Plaintiff notes that G.O 26-02-124 dated February 1, 2005 was issued to enunciate: Rules of Conduct of Employees and outlines employee behavior and conduct which is specifically required and expressly prohibited (PX-5).

---

[2] The designation "PX____" refers to Plaintiff's Exhibits, copies of which are attached hereto. Plaintiff notes that, based upon Defendant's sequence of events and format; some prior deposition exhibits are numbered twice; however, such deposition exhibits clearly reflect the deposition date noted by the Court Reporter which is not the sequence utilized herein.

G.     Plaintiff notes that G.O 11-01-115 dated February 1, 2004 was issued to enunciate: Police Mission, Objectives, and Role of the Wentzville P.D. (PX-6).

H.     Plaintiff notes that Article VI of the City Manuel describes: Employee Performance and Conduct; and Article VI Subpart 6.1 deals with the subject of: Workplace Violence. (DX-B at CWM 196 et seq.; PX-7 at CWM 999 et seq.)[3]

I.     Plaintiff notes that City of Wentzville, Mo hiring decisions is a multi-step process. Initially, once the Department of Police is authorized additional personnel, or a vacancy occurs; the Dept. of Human Resources handles the advertising, and application processing, before sending candidates to the police department for background checks and interviewing. (Holiway TR 38-39) The actual decision to hire is made within the Police Department subject to the approval of the City Administrator. (Holiway TR 38-39) Chief Noonan states that a scored value system controls the screening and recommendation process, but the City Administrator makes the final decision. (Noonan TR 73-78) Ms. Wright, however, confirmed by Ms. Holiday, suggests that she simply confirms that applicants are qualified within the criteria of the job description and she confirms the selection recommended by the Department. (Wright TR 64; Holiway TR 38-39)

**B. Plaintiff's Employment and History of Discipline**

11.     Plaintiff applied for a position with the Wentzville P.D. on December 1. 1992 and was hired on February 1, 1993. (DX-A; Zumwalt TR 21-22; PX-8).

12.     Plaintiff admits that on April 21, 1997 a Memorandum by Diana Johnson, a dispatcher, was submitted describing "problems" she alleged she was having with Plaintiff's lack of respect at her job performance; but states that document speaks for itself. (DX-D).

---

[3] Plaintiff notes that different Subparts between DX-B and DX-7 of the Wentzville City Manuel are represented and postulates that an earlier codification was denoted as Deposition Ex. 9 and subsequently amended.

13.     Plaintiff admits that his written response to an unseen complaint dated April 26, 1997 by Ms. Johnson suggests multiple problems with her job performance and his objective review of his handling of the ongoing occurrences. (DX-E; Zumwalt TR 68-70; 89) Further, this complaint resulted in no disciplinary action. (Zumwalt TR 89)

14.     Plaintiff admits that a staff member of the St. Charles County Jail complained about his behavior during a transfer of prisoner interaction with him; but denies any disciplinary action was taken. (Zumwalt 72; 74-75; DX-F)

15.     Plaintiff admits the Chief Roy Bergman corresponded with the St. Charles County Department of Corrections on May 5, 1997 and suggests the document speaks for itself; but denies any disciplinary action was taken. (Zumwalt 72; 74-75; DX-F)

16.     Plaintiff admits that Sgt. Sinopole, Plaintiff's direct supervisor at the time prepared his Performance Evaluation in March 2009 which, in part, regarding the topic of "Effectively manages dealings with the public" stated "Sometimes allows frustration to dictate behavior, however, has made great improvement in this area" and provided a score of "3" which equals "consistently meets expectation". (Zumwalt 263-265; PX-9) Further, Plaintiff further states that the document speaks for itself and reflects on overall excellent evaluation of 3.53 describing Plaintiff as a "valuable member of the Wentzville team". (PX-9)

17.     Plaintiff admits that he and Sgt. Sinoploe had multiple conversations regarding his aggressiveness, but also discussed Sinople's non-aggressive character trait. (Zumwalt 264-265).

18.     Plaintiff admits that a disagreement arose between Sgt. Magers and he regarding a procedural issue occurring in Municipal Court of Wentzville on April 16, 1998 and a Squad room incident on April 24, 1998 which both officer were required to execute a Memorandum to Lt. Pyatt. (PX-10; DX-14) Further, no disciplinary action was taken against either officer

although Plaintiff observes that Sgt. Magers became a member of his Review Board regarding the Bittick complaint. (Stewart TR 38)

19.     Plaintiff admits that Sgt. Sinopole executed an Employee Performance Evaluation Report dated July 25, 1998 which speaks for itself in all categories. (DX-J; Zumwalt TR 90-108; 263-264)

20.     Plaintiff admits that in July 1999 he was transferred in the Detective Bureau and thereafter, received an Employee of the Quarter Award. (Zumwalt TR 127-28)

21.     Plaintiff admits that he was promoted to Sergeant after a formal selection process. (Zumwalt TR 122-123)

22-23.  Plaintiff admits that he attended training on computer simulators for firearms training on December 23, 2004 that was conducted by MIRMA's Loss Control Consultant under the direction of Lt. D. Stewart, Training Officer. Further, Plaintiff admits that serious equipment and/or software difficulties caused frustrations amongst the department attendees. Further, Plaintiff denies that any disciplinary action was taken. (Zumwalt TR 129-137; PX-11) and Lt. Stewart never provided any verbal, or written counseling.

24.     Plaintiff can neither admit nor deny heresay statements attested to by Capt. Pyatt, but deny that any disciplinary action was taken by Lt. Stewart. (Zumwalt TR 129-137; PX-11; Pyatt TR 109)

25.     Plaintiff admits that he discussed the firearms training with Chief Noonan and Capt. Pyatt was present, but denies any counseling took place. (Zumwalt TR 136-37)

26.     Plaintiff admits that on September 13, 2006 Disciplinary Interview conducted by Chief Noonan regarding nine (9) charges of alleged misconduct occurring over several years that Plaintiff acknowledged a MIRMA trainer "got in his face" in December, 2004. (DX-T at 644)

27.     Plaintiff admits that during his February 28, 2005 Performance Evaluation, Lt. Dave Stewart made an overall evaluation of 3.07 reflecting that, as a Police Sergeant, he consistently met expectations; and the evaluation speaks for itself. (DX-N; PX-12 at CWM 905-906; Zumwalt TR 142-143) Further, Plaintiff states that his Performance Evaluations approximately every six (6) months between August 31, 2004 and September 26, 2008 reflects an overall average evaluation of 3.298 for the categories indicated and defined by his job description which indicates that he consistently exceeds expectations. (PX-12; Pyatt TR 101-105; Holiway 23-25) Further, Plaintiff's Performance Evaluation for March 11, 2009 by Sgt. Sinoploe was 3.53. (Pyatt TR 104-105; PX-9)

28-29.  Plaintiff admits that Ptn. Michelle Ray filed a Memorandum to Lt. E. Borrum dated March 22, 2005 regarding Sgt. Zumwalt's conduct in crowd control for a February 22, 2005 incident in the Wentzville Municipal Court and her perception of his command action. (DX-O). Further, Plaintiff admits that his Memorandum to Lt. Harry Belcher regarding a probationary officer conduct as "conduct unbecoming an officer", and Lt. Belcher resulting Memorandum to Capt. Pyatt; both reflect a more accurate summary of the event. (PX-13; PX-14; Zumwalt TR 153-173) Further, Plaintiff states that no disciplinary action was taken as result of the Memorandum by Ptn. Michelle Ray.

30.     Plaintiff admits Ptn. Michelle Ray became a vocal supporter of Local 1032/42; but received two (2) write-ups on the same day for: (a) unprofessional conduct and (b) failure to follow orders over rather inconsequential matters deemed harassment for her union advocacy (Walter TR 58-60). Further, Walter recently became the focus of an internal affair investigation for union harassment by an unknown individual shedding his union mail. (Walter TR 60-61; Walter Aff. ¶ 4, 5) However, Bill Stark is the individual the rank and file are instructed to report

to regarding harassing occurrences for union membership and he is the repository for such complaints (Walter TR 61-64).

31.     Plaintiff admits that the Performance Evaluation conducted by Lt. Stewart in August 31, 2005 provided an overall six (6) month evaluation of 3.307. (DX-AA at CWM 907; PX 12 at 907-908)

32.     Plaintiff admits that Ptn. Horvath submitted a rambling eight (8) pages of notes as a discussion of his apparent problems with a supervisor, Sgt. Zumwalt, who was fulfilling his responsibilities to a subordinate who was not meeting minimum job responsibilities in December 2006. (DX-Q). Further, Chief Noonan discussed the notes on September 16, 2006, when interview Plaintiff on other issues concerning the Whyte Complaint. (DX-T at CWM 643).

33-41.  Plaintiff admits that on or about September 13, 2006, Ptn. Thomas Whyte filed a complaint alleging a Hostile Work Environment caused by a July 21, 2006 occurrence regarding an alleged pushing incident and a September 9, 2006 occurrence alleging that Sgt. Zumwalt was acting both verbally and allegedly physically aggressive toward him in front of other personnel. (DX-R) Further, Plaintiff admits that Capt. Pyatt conducted an Internal Affairs investigation reviewing Whyte Complaint and commenting on several items in his Personnel File (PX- 15). Further, on or about September 13, 2006, Chief Noonan provided Plaintiff with a Corrective Action Report and then conducted a mitigation interview regarding all said occurrences from his personnel file. (PX-16; DX-T) Further, on September 26, 2006, Chief Noonan entered his Findings on Employee Misconduct Report which confirmed a demotion to Patrolman, placed him on six (6) months probation, and ordered him to complete Employee Assistance Programs, as directed (DX-U). Further, a document called a Last Chance Agreement which was executed by Plaintiff and stated in its pertinent parts; to-wit:

8

**City of Wentzville agrees to:**
Postpone termination proceeding pending the outcome of the terms listed below.

**The Employee agrees to:**
1. Enter into and sign this Last Chance Agreement and all related EAP documents/releases
2. Complete all programmatic requirements of the EAP.
3. Permit the monitoring of attendance and participation in the recommended action plan through the EAP.
It is agreed by all parties that if the employee successfully completes all programmatic requirements, as confirmed by the EAP the pending termination action will be dismissed or reduced. Any failure to permit monitoring by the EAP or failure to comply with company policy will result in termination. Any future violation of the same or similar conduct or policy violation will result in termination without the opportunity for a Last Chance Agreement. (DX-V)

Finally, Plaintiff notes that Capt. Pyatt's investigation failed to seize appropriate sally port video logs, and/or interview other direct witnesses to the squad room events; yet Ptn. Jason Horvath and Michelle Ray, Cindy Mager, and Paul Burkemper were interviewed regarding prior occurrences which happened up to some four (4) years prior to the instant Whtye's complaint. (Zumwalt TR 186-208; PX-15 at CWM 632) Further, Plaintiff denies that a heavy jail facility door on a pully system can be slammed by anyone.

42-46.  Plaintiff admits that he was interviewed by Chief Noonan on or about September 26, 2006. (DX-T at CWM 642-653) Further, Plaintiff notes that the balance of the interview was previously conducted by Capt. Pyatt on September 20, 2006. (DX-T at CWM 654-675). Further, both interviews speak for themselves as to the participant's comments and Plaintiff question's the accuracy of both interviews as represented as incomplete and/or commingled improperly.

47-48.  Plaintiff admits to the decision of Chief Noonan to demote him from Sergeant to Patrolman; place him on six (6) month probation, and refer him to EAP (DX-U) and opined that his "supervisory" performance was clouded with hostile and improper conduct. (DX-U; Zumwalt TR 186-208)

49.     Plaintiff admits that he entered into a so-called "Last Chance Agreement" (DX-V);but disputes the suggestion that its terms last forever. Further, the document speaks for itself and simply states that, should the "same or similar" conduct occur; no Last Chance Agreement would be offered. (Zumwalt TR 186-208)

50.     Plaintiff admits that his overall Employee Performance Evaluation between August 31, 2004 and September 26, 2008 reflects an average overall evaluation of 3.298 for the categories indicated and defined by his job description suggesting he consistently exceeded expectation of his direct supervisor in his job performance (PX-12; Pyatt TR 101-105; Holiway 23-25). Further, Plaintiff admits that Lt. H. Belcher evaluation of September 24, 2006 speak for itself (DX-BB; PX-12 at CWM 911-12)[4] and Lt. L. Burton evaluation of February 28, 2007 was a 3.5625 and comments that he "personally" would like to have a platoon full of Ptn. Zumwalt's (PX-12 at CWM 913-914)

51.     Plaintiff admits that he did not refuse to sign or appeal any semi-annual assessment made by supervisors regarding his performance during his employment with City of Wentzville, Missouri since he consistently met expectations of his employment as defined by his job description. (Zumwalt TR 152-153; PX-12; DX-AA; DX-J)

52.     Plaintiff admits that he utilized the City of Wentzville, Missouri fair treatment and open door policy through Step 3 on multiple occasions; but never to Step 4 until his appeal on or about August 17, 2009, because most of the so-called disciplinary actions were no more than verbal counseling and there was nothing to appeal. (PX-17; PX-18; Zumwalt TR 46-48) Further, Plaintiff states that, subsequent to the change of an Employee's right to appeal to the Board of

---

[4] DX-BB is an August 3, 2009 interview between Lt. D. Stewart and Ptn. Robert Walter regarding the Bittick complaint, not a performance evaluation. Further, DX-AA reflects Lt. Stewart evaluations October, 2004; March, 2005, and September, 2005. Plaintiff's PX-12 at CWM 911-912 reflects the November, 2006 performance evaluation.

Alderman of the City of Wentzville, Mo; any appeal process to the City Administrator lost its objectivity and most verbal complaints were not the subject of retaliation. (Zumwalt TR 46-56)

J.      Plaintiff notes that profane language is common place between police officers within the Wentzville P.D. (Burton TR 25-26); in everyday conversation within the department (Walter TR 34-35); occasionally, but not routine; and opinions which are stated by others may have been different within the squad room (Noonan TR 56-58); whether language is offensive depends on the circumstance and Bittick was offended; (Stewart TR 52-53); in 2009; Stewart filed report of excessive use of profanity within the department  regarding the MIRMA training occurrence without reference to Plaintiff at that time. (Stewart TR 55-56; Pyatt TR 109-110; PX-11) Further, Plaintiff notes that only one other police officer in the Wentzville P.D. that has even received a formal written write-up for profanity for using "f**k" during a traffic stop was given a verbal warning with no additional repercussions.  (Walter TR 37-38; 48)

K.      Plaintiff notes that until September, 2009 as a result of the Whyte Complaint, Plaintiff's personnel file reflected prior complaints with timely responses which lead to no adverse job actions and/or suspensions (Zumwalt TR 59-60).

L.      Plaintiff notes that the so-called "Last Chance Agreement" is defined by its terms and, upon successful completion of those terms, only similar conduct should predicate a formal complaint procedure. (DX-V). Further, pursuant to G.O. 26-02-124; the complaint referred to as the Peine Ridge Incident constituted conduct in violation of said Last Chance Agreement of September 28, 2006; but the Last Chance Agreement was never raised since by it's terms, it had expired and the Corrective Action Report prepared by Robert Noonan resulted in a Written Warning only (PX-19; Zumwalt TR 209-210; Sinopole TR 18-22)

M.      Plaintiff notes that the Disciplinary process is defined by the G.O 52-01-212 (PX-4). Initially, all complaints are to be handled and categorized by the line supervisory in either a "formal", or "informal" category dependant on their "good judgment and common sense". In its pertinent part, the General Order states:

## IV. COMPLAINT CATEGORIES

A. The type and nature of a complaint shall determine whether it can be handled and resolved at the line supervisory level or referred to the Chief of Police for a formal Administrative Review process.
B. Not all complaints can be automatically categorized. Supervisors are required to exercise good judgment and common sense when they are made aware of a complaint. The following types of complaints are examples of those which are categorized as "formal," which required automatic referral to the Administrative Review process, or "informal," which may be resolved at the supervisory level of the employee:
1.      Formal Complaint Examples
        Allegations of:
        a. brutality;
        b. misuse of force;
        c. breach of civil rights; and
        d. criminal misconduct
2.      Informal Complaint Examples
        Allegations of:
        a. failure to take appropriate police action
        b. poor demeanor displayed by employee;
        c. tardiness; and
        d. insubordination.

Further, Plaintiff notes that his boorish comment to Robert Bittick was construed by Lt. Burton "more than a minor complaint"; but was "language between two police officers" that did not rise to take the level of "brutality; misuse of force; breach of civil rights; or criminal conduct" which are the examples. Further, Burton states "it doesn't have to fall under that for me to consider it something formal". (Burton TR 21; 36-37) Further, Lt. Stewart acknowledge that the Bittick complaint did not fall into the categories of "brutality; misuse of force; civil rights; or criminal misconduct; but it was "serious enough", and the comment constitute " a threat of force" even though conversation only and placed Bittick "subjectively in fear it could happen

12

again". (Stewart TR 24-27). Further, Capt. Pyatt opined that the Bittick complaint involved each category: brutality due to his aggression; could have been misuse of force; breach of civil rights; and criminal misconduct. (Pyatt TR 94-96).

N.     Plaintiff notes that, as an example of comparative discipline, that Chief Noonan determined that Lt. Emmanuel Borroum receipt of an Ex Parte Order of Protection from Latoya Stewart filed on January 19, 2007 in Cause No. 07L6-PN00029 in Lincoln County, and the subsequent Consent Order for a Full Order of Protection on February 2, 2007 was not an "enforceable violation of existing city or departmental policy". (PX-20; PX-21) Therein, Ms. Stewart verified allegation of domestic violations on two (2) occasions; include but is not limited to; allegations of; assault; flourishing a dangerous and deadly weapon (service revolver), burglary; and false imprisonment. (Noonan TR 82-86) Further, Chief Noonan determined that a subsequent confrontation to Ms. Stewart's residence in January 2008 was unfounded as an argument with her relative and occurring off-duty. (Noonan TR 87-89). Plaintiff notes that Chief Noonan addressed the change of shift when new reports of Sgt. Borroum Ex Parte Order litigation came out and he cursed throughout the roll call address. (Walter TR 35-37)

Further, Chief Noonan acknowledge that Sergeant Borroum was the focus of a sexual harassment complaint filed by a dispatcher, Geneviene Roberson, in November 2003; but it was investigated and determined that a probationary period of one (1) year was appropriate. (PX-22; Noonan TR 89-91) Further, Chief Noonan acknowledges that Lt. Borroum was determined to be insubordinate and guilty of conduct unbecoming an employee when on June 2, 2008 when he berated, cursed, and yelled loudly at Capt. Pyatt while at Police Headquarters. (PX-23; Noonan TR 91-92). Chief Noonan described Lt. Borroum stress at this last incident and suggested there was an "informal" last chance agreement; because, if a fifth (5) incident occurs in the future, "he

will be gone". (Noonan TR 92-93). Finally, Plaintiff notes that between the Roberson harassment complaint in 2003 and the present, Sgt. Borroum was promoted to Lieutenant and Sgt. Zumwalt was demoted to patrolman for their respective conduct. Further, Plaintiff notes that police officers within the Wentzville Police Department were terminated only if they broke the law, but never for "conduct unbecoming an officer" from 2000 to the present in Walter experience. (Walter TR 40-41)

      O.      Plaintiff has previously noted that hiring within the Police Department is predominantly influenced by Chief Noonan's recommendation (see Plaintiff Response, ¶ I). Chief Noonan acknowledged that Ptn. Teresa Claudin was hired, and her father was a co-worker of his at Jennings P.D. (Noonan TR 126-127). Ptn. Gary Conners also worked with him in Jennings. (Noonan TR 127). Ptn. Jason Horvath's father also worked with him in Jennings P.D. (Noonan TR 127). Further, Chief Noonan acknowledges that his son, Bill Noonan, is a retired Metropolitan St. Louis police officer. His son recommended Ptn. Jean Huntoon whom Wentzville hired. (Noonan TR 127) He did not know his son knew Ptn. Thomas Whyte until after he hired him (Noonan TR 127). Ptn. Joe Right was a city police officer and he called his son about Ptn. Right, but almost every St. Louis officer knows every other St. Louis officer. (Noonan TR 127-128)

      P.      Plaintiff notes that the City of Wentzville Employee Performance Evaluation Report n/k/a Performance Appraisal is conducted on a semi-annual basis of each employee, and the categories listed below come directly from the job description taken from the personnel manual (Holiway TR 23-25; DX-J; PX-12). Further, Chief Noonan acknowledges that Ptn. Zumwalt's evaluations were "generally…high"; but his concern was his "continuing aggressiveness". (Noonan TR 54) Although, Plaintiff consistently met expectations in the

categories listed and evaluated, Chief Noonan opined that "other categories" defined an officer's image in the community. (Noonan TR 51-55).

### C. The Events of August 1, 2009 and Resulting Investigation

53-54.  Plaintiff admits that an off-duty Foristell police officer, Robert Bittick, attended the St. Charles County Fair between 6:45 pm and 12:15 pm with an unknown group of people after his day shift ended at 6:00 pm. (Bittick TR 7-8). Further, while on the fairgrounds, he observed a flat bed white Chevy pickup with multiple subjects driving erratically when leaving. (Bittick TR 9)

55-57.  Plaintiff admits that Robert Bittick contacted by cell phone Ptn. Walter of the Wentzville P.D. and advised him of the vehicle's erratic actions and, after following the vehicle for approximately a mile; Ptn. Walter initiated a traffic stop. (Bittick TR 10-11) (Walter TR 7-8) Further, Walter made an open call to dispatch regarding the traffic stop; but never indicated that anyone was with him, even though he was aware that Bittick had parked behind him. (Walter TR 9-10).

58-59.  Plaintiff admits that Bittick advised Ptn. Walter he was parking his civilian vehicle behind him and he was dressed in civilian clothes. (Bittick TR 11-13) Further, Bittick left his vehicle and proceeded to take a position next to Walter's police vehicle by the passenger front door area. (Bittick TR 13).

60.     Plaintiff admits that Bittick observed Walter converse with the driver and begin to conduct field sobriety tests. (Bittick TR 13-14)

61.     Plaintiff admits that he arrived shortly hereafter and pulled behind Bittick's vehicle. (Bittick TR 15-16) (Zumwalt TR 258).

62.     Plaintiff admits that, upon parking; he approached Bittick stating "Can I help you?" (Zumwalt TR 258).

63.-65  Plaintiff admits that Robert Bittick stated he was an off-duty Foristell Police Officer, but had no identification on him. (Zumwalt TR 258; Bittick TR 24) Further, Plaintiff admits his initial comment was "That's fine, next time park in the parking lot". (Zumwalt TR 258-259)

66.     Plaintiff admits that, upon Bittick continuing his comments; he then stated to him that "Next time park in the f**king parking lot, so somebody doesn't throw you down", or words to that effect. (Zumwalt TR 258-260).

67.     Plaintiff admits that Bittick left the scene after this conversation. Further, the conversations, or comments, took place as the parties walked toward each other and Plaintiff stepped aside as Bittick got in his vehicle. (Bittick TR 26-28; Zumwalt TR 258-259)

68.     Plaintiff admits that he was concerned about providing back-up to Ptn. Bob Walter who had a passenger jumping out of the stopped vehicle because Bittick did not appear to have a weapon or identification. (Zumwalt TR 259-260)

69.     Plaintiff admits that Bittick called Ptn. Walter sometime later that next morning and was pretty upset suggesting "he screamed and yelled at me." (Walter TR 12-13) (Bittick TR 32-33) ; which is  denied. (Zumwalt TR 260-261)

70.     Plaintiff admits that Lt. Burton was the shift supervisor between late July 31, and early August 1, 2009 and Walter informed him that Zumwalt and Bittick had a disagreement. (Burton TR- 10-11)

71.     Plaintiff admits that Lt. Burton received a call from Bittick at his desk early the next morning and Bittick informed him that as he contacted Walter about a DWI and stopped

16

with him to assist; Zumwalt pulled up and, as he was getting into his car, he was told that next time he should park in a parking space so he wouldn't have to slam him to the ground. Further, Bittick was upset and Lt. Burton indicated Bittick indicated these words were said in a rude, threatening, and angry manner. Further, Bittick's complaints failed to state that he was drinking all evening in civilian clothes; was driving a civilian vehicle; and had no I.D. on him. Further, Bittick did not indicate that Zumwalt ask him why he was staking out a patrol officer on a traffic stop and was behind Ptn. Walter. (Burton TR 13-15)

72.    Plaintiff admits that Lt. Burton took Bittick's number to review the complaint and, without consulting anyone, recalled Bittick that evening to review the occurrence again by phone. Further, when Bittick reiterated his same story; he asked for a written complaint. (Burton TR 12-25). Further, Burton then drove the complaint form to a Foristell supervisor on Saturday evening to exchange the form and retrieved it as executed the following Sunday evening about 6:00 pm. (Burton TR 26-28) Further, Burton does not recalled whether he orally informed Capt. Pyatt of the complaint regarding Zumwalt on Saturday, or Sunday. (Burton TR 29; PX- 24)

73.    Plaintiff admits that Lt. Burton and Capt. Pyatt discussed the complaint on Saturday evening by phone. (Pyatt TR 24) Further, Capt. Pyatt states that Lt. Burton called him on the evening of the incident and informed him that Ptn. Walter had been contacted by Ptn. Bittick and he was upset over Ptn. Zumwalt's behavior at the traffic stop. Further, Capt. Pyatt states like "any complaint, we check it and investigate it". The allegation was about an "argument or aggressive behavior" toward Bittick on the call, and he told Lt. Burton to follow through and contact the complaint. (Pyatt TR 24-26).

74.     Plaintiff admits on Monday August 3, 2009, Capt. Pyatt provided the Bittick complaint and a copy of the Last Chance Agreement date 9/28/2006 to Lt. Stewart. (Stewart TR 10; 33)

75.     Plaintiff admits that the sum total of the investigation conducted by Lt. Stewart regarding the Bittick complaint was to interview Ptn. Walter at 4:00 pm on August 3, 2009 and subsequently interview Ptn. Bittick of Foristell P.D at 4:30 pm after which he filed his Internal Affairs Report with Chief Noonan on August 4, 2009. (Stewart TR 15-17). Further, Plaintiff admits that Lt. Stewart conducted absolutely no other review of possible objective evidence; dispatch tape;  dispatch logs;  vehicle camera logs; and did not investigate Bittick activities at the County Fair. (Stewart TR 15-17; 31-32). Further, Plaintiff admits that Lt. Stewart knew nothing about Bittick except that he filed a complaint. (Stewart TR 32).

76.     Plaintiff admits that on August 4, 2009, Lt. Stewart submitted his complete Internal Affairs Report to Chief Noonan consisting of his summary of interviews with Ptn. Walter and Ptn. Bittick and that no other investigative avenues were pursued involving the complaint solicited by Lt. Burton. (Stewart 15-17; 31-32; DX-JJ; DX-KK) Further, Lt. Stewart's Report attached the Notification of Charges dated August 6, 2009 to his report suggesting Chief Noonan decision to suspend Plaintiff had already been made as the report was typed and finalized before August 6, 2009. (PX-25 at CWM 757)

77.     Plaintiff admits that Chief Noonan had no contact with Ptn. Bittick, but presumptively remains informed regarding the limited nature of the investigation by Lt. Stewart and the daily reporting by Capt. Pyatt. (Noonan TR 33-36)

78.     Plaintiff admits that on or about August 6, 2009, Chief Noonan suspended him with pay pending further investigation. (DX-CC; DX-DD; Stewart TR 17; Zumwalt TR 218)

18

79.     Plaintiff admits that attached to the Notification of Charges/Allegations dated August 6, 2009, was a supplement page denoting Violations alleged to occur as a result of the Bittick Complaint and including only a reference to the 9/28/06 Last Chance Agreement without reference to any other prior personnel file entries. (DX-CC at CWM 774)

80.     Plaintiff admits that, upon advisement, Lt. Stewart conducted a recorded interview of him regarding the events of July 31, 2009- August 1, 2009. (DX-FF) Further, Plaintiff admits that Lt. Stewart acknowledged that, even though Bittick may have made a tactical mistake by observing Walter from behind in civilian clothes without I.D. during a traffic stop after midnight; Plaintiff's comments were inappropriate. (DX-FF at CWM 794) However, Plaintiff denies making any threatening comments to Bittick. (DX-FF at CWM 794)

81.     Plaintiff admits that the statement "next time park in the f**king parking lot, so somebody doesn't throw you down" was made during his conversation with Bittick since Bittick's action of stopping in a dark area, without I.D, was a tactically a bad mistake with respect to  any officer trying to back up Walter. (DX-FF at CWM 785)

82.     Plaintiff admits he told Walter that Bittick made a big mistake and he could have been braced for his action by any responding back up officer. (DX-FF at CWM 785-786; Stewart TR 27-28)

83-84.  Plaintiff admits that Chief Noonan sometimes utilizes a Review Board to determine what, if any, discipline may be administered as a result of a complaint involving a potential suspension, or termination. (Pyatt TR 56-64) Plaintiff notes specifically that the Chief's Review Board was not the subject matter of a general order but a subject matter of a "protocol" within the department. (Pyatt TR 65-66) This "protocol" became a General Order in 2010. Further, Capt. Pyatt acts as a facilitator to the Review Board and Lt. Stewart presents his

investigative result. (Stewart TR 35-37) Further, Lt. Stewart had no first hand knowledge of any prior disciplinary events regarding John Zumwalt, and his report of the Review Board deliberations reflects that Capt. Pyatt would supply such knowledge of prior discipline that   was enumerated for the first time in September 2006 with his demotion and the Last Chance Agreement. (DX-GG; Pyatt TR 63-67) Further, Plaintiff states that Chief Noonan's decision to terminate Zumwalt based upon the "severity of the charges" was under discussion prior to the Review Board. (Pyatt TR 65) Further, as facilitator, Capt. Pyatt summarized for the Board of all prior disciplinary issues and his opinion regarding the ongoing effect and longevity of the Last Chance Agreement which, by its term's, ended after six (6) month's of Plaintiff's compliance with it's term's on or after September 28, 2006. (DX-GG; DX-V; Response ¶ 33-41)

85-96.  Plaintiff admits that Lt. Stewart and/or Capt. Pyatt misinformed, or misinterpreted, the Review Board of Plaintiff's neutral prior occurrences in his personnel file describing them as disciplinary actions. (DX-GG; see Subpart B disputed)

97.     Plaintiff admits the Review Board conferred for approximately one (1) hour (DX-GG).

98.     Plaintiff admits that Ptn. Rivera asked about the duration of the Last Chance Agreement; but denies it has no expiration date and is governed by its own terms. (DX-GG; DX-V; Response ¶ 33-41)

99-101.       Plaintiff admits the Review Board summary report prepared by Lt. Stewart speaks for itself and that the determination of violation on each charge was made regarding the July 31/August 1, 2009 occurrences based upon the information provided by Capt. Pyatt and Lt. Stewart which failed to reflect a thorough investigation of the occurrence of July 31/ August 1, 2009,  since it did not disclose Bittick alcohol impairment; his inappropriate police procedure by

acting as a civilian back up without I.D. in an area behind the responding Wentzville Officer to a traffic stop with multiple occupants to a vehicle late at night. (DX-GG; PX-25)

102.    Plaintiff admits that the Review Board discussed appropriate discipline, but could not realistically discuss past discipline since they were misinformed about the nature and impact of prior occurrences. (DX-GG; see Subpart B disputed).

103-105.    Plaintiff admits the Review Board's summary speaks for itself, but suggests it was misinformed and misdirected and voted to terminate/dismiss him from employment with Wentzville P.D based upon the incomplete and mischaracterized facts presented to the Board. (DX-GG; see Subpart B disputed).

106.    Plaintiff admits that the Corrective Action Report informing him of his termination of employment from the City was given him on August 12, 2009. (Noonan TR 44-46; DX-HH)

107.    Plaintiff admits that the Corrective Action Report reflects that Chief Noonan determined that he violated the following General Orders or City Policies; to –wit;

General Order 26-02-124 Rules of Conduct; Sect 1, subsect A4

General Order 26-02-124 Rules of Conduct; Sect 1, subsect B2

General Order 26-02-124 Rules of Conduct; Sect 1, subsect B27

General Order 26-02-124 Rules of Conduct; Sect, subsect B28

General Order 11-01-115 Department Mission, Sect II, subsect J5

City Policy Manual 7.2 Improper Conduct- Section j

City Policy Manual 7.2 Improper Conduct- Section x

City Policy Manual 7.3 Disciplinary Procedures- Section ii

(DX-HH, PX-5; PX-6; PX-7; Zumwalt TR 251)

108-109.   Plaintiff admits the Corrective Action Report speaks for itself. (DX-HH)

110.   Plaintiff admits that he sought an immediate timely appeal from the termination notification by Chief Noonan in conformity with the Uniform Personnel Rules and Regulations of the City of Wentzville and submitted his List of All Witnesses whom he wished to testify, together with a brief statement of their relevant testimony, and his allegations of both pretextual and retaliatory reasons for Chief Noonan's decision to the City Administrator, Ms. Dianna Wright based upon his union activities as both a Shop Steward and Contract Negotiator. (SAC ¶1-15; PX-26; PX-27)

Further, Plaintiff specifically advised Ms. Wright of his belief that his union association was a significant role in the inadequate investigation which led to the decision of August 12, 2009 to terminate him. In it's <u>pertinent part</u>, his letter of Appeal reads as follows; to-wit:

> The Police Department is aware of my position as a representative of the Union acting in two capacities, as a Shop Steward and Contract Negotiator. The sheer negligence in their investigation leads me to believe that my involvement in the Union played a significant role in their actions. I ask that you accept this list of witnesses, and make your own finding based on the facts presented in conjunction with relative laws of procedure for this appellate board. I look forward to the opportunity to review the evidence against me, since I was not provided this very basic due process. (PX-27 page 2)

111.   Plaintiff admits that pursuant to the City of Wentzville's Problem Solving Procedure/Administrative Grievance process the Step Four review from you supervisor (Chief Noonan) is to the City of Administrator office. (DX-B at CWM 190-191; Zumwalt TR 46-48)

112.    Plaintiff agrees that Ms. Wright provided a hearing on August 25, 2009 to address his issues underlying the rationale for the termination decision. (SAC ¶ 15-16; PX-26; PX-27)

113-117.    Plaintiff agrees that the hearing was held on August 25, 2009 before Ms. Wright which he tape recorded; that his witnesses were called while his neutral party was

present; and the recording reflects the respective comments of all witnesses and attendees. (DX-X; Zumwalt TR 255-261) Further, Plaintiff admits that he contested his termination based upon an incomplete and pretexual termination that the use of a curse word was serious violation of City Policies and General Orders; that his personnel record was inaccurately reviewed; and his union association was a substantial factor in his termination. (DX-X) Further, Plaintiff's inquiry regarding the specific of the Hearing and the concern regarding the entries into his personnel file and his need to respond was never responded to by Ms. Holiway.

118.    Plaintiff admits that the transcription is an accurately transcribed rendition of the respective comments of all witnesses and attendees. (DX-X).

119-120. Plaintiff admits that Ms. Wright confirmed with Ptn. Ellis that all parties to the hearing participated while she took notes and asked relevant questions (DX-X).

121-122. Plaintiff admits that on August 26, 2009, Ms. Wright upheld the City of Wentzville's termination of Plaintiff's employment in furtherance of Chief Noonan's decision of August 12, 2009 (DX-HH; PX-28).

123.    Plaintiff acknowledges that Ms. Wright did not participate in the initial investigation of the Bittick complaint. (Zumwalt TR 265-267; Wright TR 32) Further, Plaintiff notes that Ms. Wright reviewed the Corrective Action Report and spoke to Chief Noonan and Ms. Holiway prior to the report being given to Plaintiff. (Wright TR 31-35).

Q.    Plaintiff notes that Robert Bittick's perception of what occurred during the incident was subject to his acknowledgement that he was drinking "a beer an hour" between 6:45 pm and midnight. (Bittick TR 7-8; 31) Josh Smith described "10 to 13" cups of beer between 8:00 pm and midnight. (DX-X at 00013) Further, Bittick was in civilian clothes; driving his civilian vehicle after midnight when he attempted to back-up Ptn. Walter. (Bittick TR 11-13)

23

R.     Plaintiff notes that the appropriate police procedure upon an officers arriving as back-up to a police officer involved in a traffic stop is to position his vehicle behind the officer's vehicle in a safe position. Further, he then asks anyone not involved with the stopped vehicle who they are and, if they can not produce ID, to ask them to leave. (Burton TR 16-17; Stewart TR 28-29; Pyatt TR 81-82; Noonan TR 113-114)

S.     Plaintiff notes that both the extent, and nature, of internal affairs investigations conducted by either the Lieutenant of Support Service; Capt. Pyatt; or anyone directed by Chief Noonan resulted in reports that apparently lacked objectivity. Further, Stewart's investigation of the Bittick Complaint was limited to two (2) interviews and no other audio, or visual record was reviewed (PX-25); the Whyte Complaint of September 2006 resulted in several interview's of individual's regarding the events of some prior three (3) to four (4) year period as opposed to the specific occurrences complained of by Ptn. Whyte. (DX-DD; DX-T)

T.     Plaintiff notes that Chief Noonan opines that Ptn. Bittick's drinking all evening was "inconsequential". (Noonan TR 113); Lt. Stewart felt there was no reason to investigate Bittick's conduct and he had no evidence of his consumption of alcohol (Stewart TR 64-65); Lt. Burton had no curiosity about Ptn. Bittick's activities earlier that evening (Burton TR 22); Capt. Pyatt has no knowledge of his drinking five (5) or six (6) beer at the County Fair that evenings and Bittick was not questioned "He was a complainant". (Pyatt TR 53-54)

**D. The Organization and Decertification of Local 1032/42**

124.     Plaintiff admits that on February 25, 2009, the non-supervisory members of the Wentzville Police Department voted to establish the Laborer's International Union of North America (LIUNA) Local 1032 as their collective bargaining agent. (Zumwalt TR 234; PX-29)

125.     Plaintiff admits that Ptn. Robert Walter was the individual predominantly responsible to bring the union organizers into the Wentzville Police Department; but denies Plaintiff failed to identify other proponents and, specifically, states that the deteriorating morale within the department regarding the disparity in treatment regarding disciplinary issues became a progressively troublesome issue over years within the department that culminated in the formation of the union. (Zumwalt TR 221-228)

126.     Plaintiff denies the characterization that he does not know the primary advocates for the formation of the union, but acknowledges that the topic became a much discussed subject amongst department personnel in the months leading up to the Certification vote on February 25, 2009. (Zumwalt TR 219-228)

127.     Plaintiff admits that he is a member of a laborer organization Local 1032/42, but does not recall the date he signed his union card in 2008 as he became a union advocate. (Zumwalt TR 218-220)

128.     Plaintiff admits that the department-wide frustration of non-supervisory police officer's toward the disparity in treatment regarding personnel practices was the reason that a majority of the officers became union advocates in the same way Plaintiff did. (Zumwalt TR 225-228)

129.     Plaintiff admits that, subsequent to the Certification of Local 1032/42; he consented to become a shop steward in the spring of 2009. Further, based upon his experience, he became a member of the bargaining committee. (Zumwalt TR 229-230; PX-30)

130.     Plaintiff admits that the first bargaining session between Local 1032 and the City of Wentzville occurred on July 6, 2009, and was introductory in nature. (Zumwalt TR 234)

131.    Plaintiff admits that neither Chief Noonan, Ms. Wright, Capt. Pyatt, nor other command staff personnel told him he was to be fired after they found out he was in the union. (Zumwalt TR 238) Further, he did not speak to Chief Noonan after the election and before the first bargaining session. (Zumwalt TR 234-238)

132.    Plaintiff admits that the City may have been unsure of his placement on the bargaining committee until the July 6, 2009 session. (Zumwalt TR 234-235)

133.    Plaintiff admits that his belief is that he was terminated based upon his association with the union, but he knows of no other voting police officer in the City of Wentzville who was terminate for a similar reason at that time. (Zumwalt TR 239-240)

134.    Plaintiff admits that the City and the Union bargaining sessions took place monthly from July 2009 to September 2010 or "a dozen, if not a few more". (Walter TR 45)

135-136.    Plaintiff acknowledges that the bargaining sessions were conducted a professional, and cordial, fashion and that progress was made on certain issues. (Zumwalt TR 241-242)

137-138.    Plaintiff admits that Chief Noonan, Capt. K. Pyatt, Ms. Amy Holiway, and Mr. Ivan Schraeder, legal counsel for the City of Wentzville, served as the City's bargaining committee. Further, Ms. Wright was not on the bargaining committee and did not participate in the sessions. (Zumwalt TR 243; Wright TR 51)

U. Plaintiff notes that the transfer of a city employee's right to file his appeal on a disciplinary action before the Board of Alderperson, but rather to the City Administrator in early 2001-2002: lead to loss of objectivity in the appeal process since the City Administrator's review was pointless and you would invariably end up in punishment. (Zumwalt TR 47-48) Verbal complaints lead to less retaliation. Only recently has every complaint been in writing, and it puts

26

a ding on your record. (Zumwalt TR 54-57) Over the last few years, written write-ups are more frequent; and even if unfounded, a personnel file entry is made anyway and it's treated as prior disciplinary action. (Zumwalt TR 58-60)

      V.    Plaintiff notes that the General Orders issued by the Police Department of the City of Wentzville are to be complied with, but they are subjective and often contradictory of each other which requires a command staff member to interpret and ascertain that they are complied with in a fashion consistent with the circumstance of each case. (Zumwalt TR 33-34)

      W.    Plaintiff notes that Chief Noonan acknowled that there has been a disparity in the exercise of discipline, as administered, by his command staff based upon their different opinions and perceptions of the application of the General Orders. (Noonan TR 137-141) Chief Noonan notes that since before this litigation, the rules and regulations of the Department were being enforced inconsistently by his lieutenants and/or watch commanders. Further, some issues of discipline were made formal by one but not another; and informal complaints are resolved by one, but not others: all for the same conduct. While he does not recall ever reversing the administrative handling of either an informal, or formal, complaint; by trying to identify inconsistent disciplinary activities, he has begun conversation with his staff to address the lack of uniformity in how the disciplinary process is being enforced and administered. (Noonan TR 141-144) While he has not made a qualitative study of these disciplinary problems in light of all complaints over the past three (3) to five (5) years; his command staff of sergeants, and above, are conferring with all personnel to develop a comprehensive matrix that will define codes of behavior for every violation that is significant enough to have a disciplinary action. (Noonan TR 143-145) No document is presently available, but a draft should be completed within a few months. (Noonan TR 146)

X.      Plaintiff notes the Bill Stark contacted Ms. Wright and Chief Noonan in June 2008 to disclose LIUNA Local 32 was beginning an organizing effect and to provided them with notice of informational meetings being established. (PX-31) Further, Ms. Wright subsequently notified Mr. Stark that the City of Wentzville had secured counsel and all future communication regarding the issue of the Local's desire to organize and represent the Wentzville Police Department personnel should be directed to Mr. Ivan Schraeder of The Lowenbaum Partnership, LLC. (PX-32; Stark. Aff. ¶ 13)

Y.      Plaintiff notes that while the Local 1032 conducted informational meetings with prospective members of rank and file of the police department throughout the fall, Counsel for the respective parties set the election for February 25, 2009 to be conducted by an independent monitor, LR. Consulting Service. (PX-29) Further, the City's ostensible neutral posture on the outcome of the election belies the electioneering conducted by Chief Noonan, Ms. Wright, and Ms Holiway, in the form of a letter, or email, campaign to "Commissioned Police Officer" on February 11th, 13th, 20th  , 21st, and, 22nd, 2009. (PX-33); (Wright TR 47-48); (Noonan TR 63-64; Walter Aff. ¶ 6) Further, Ms Wright acknowledges that her letter was, in fact, written for her by Human Resources and/or the City's Legal Counsel. (Wright TR 49-50)

Z.      Plaintiff notes that the second bargaining session between the Union and the City of Wentzville, Mo took place on August 1, 2009; The bargaining session became a demand for reform of the employee's grievance process concerning the disparity in treatment between department personnel and the right to an impartial grievance procedure concerning any disciplinary decision. (Stark Aff. ¶ 13) During the course of the bargaining session, Plaintiff repeatedly described incidents where certain individuals either were not disciplined in spite of serious breaches of regulations, while others were disciplined over relatively inconsequential

breach of regulations without apparent regard to the issue of  the even-handed administration of disciplinary issues. Further, Capt. Pyatt repeatedly disputed Plaintiff's description of events, or occurrences. (Stark Aff ¶ 13);

AA.    Plaintiff notes that on or about August 27, 2010, the respective bargaining units of Local 1032/42, and the City of Wentzville, Mo agreed to a Memorandum of Understanding to cover their relationship over the next three (3) year, subject to the approval of their respective principals. (PX-34) Further, that on or about September 23, 2010, the member of the police bargaining unit ratified the tentative agreement and Bill Stark notified Ms. Wright of that development on September 28, 2010, while the Local awaited the determination of the Board of Alderperson of the City of Wentzville, Mo. (PX-35)

BB.    Plaintiff notes that on October 18, 2010 LIUNA Local 1032 merged with LIUNA Local 42, and notified City of Wentzville, Mo counsel. (PX-36)

CC.    Plaintiff notes that on or about November 19, 2011 without prior notice to LIUNA Local 1032/42, Counsel for the City of Wentzville notified LIUNA Local 1032/42 that a Petition for Decertification of the Wentzville bargaining unit had been filed November 4, 2010. Further, as a result of the Decertification petition; the Board of Alderpersons for the City of Wentzville rejected LIUNA's notice of an Amended Certification (merger) (PX-36); tabled the collective bargaining agreement (PX-35); and set an election to challenge the Local's majority status with the bargaining unit for December 15, 2010. (PX-37) Plaintiff further notes the LIUNA Local 1032/42 filed suit in St. Charles County, Missouri in a suit styled: <u>LIUNA, Local 1032/42 v. City of Wentzville</u> Cause No. 1011-CV-12159 in order to request a Temporary Restraining Oder and Injunctive Relief per its terms. (PX-37)

DD.     Plaintiff notes that, as a result of the litigation and their dispute regarding who held the confidence of the majority interest within the members of the bargaining unit consisting of the commissioned police officer of the Police Department of the City of Wentzville; an election was scheduled for March 9, 2011. (PX-38)

EE.     Plaintiff notes that Ms. Dianna Wright management procedures is to have a weekly meeting with all Department heads and then confers on an as-needed basis throughout the week with an individual Department head and, therefore, manages by exception". (Wright TR 11-14) Further, if a problem is brought to her attention, she will review both the department action and the particular departmental problem in order to act as the final arbiter of decision making for the City and to anticipate any appeals which may, or might, follow. (Wright TR 11-14)

FF.     Plaintiff notes that Ms. Wright states that any disciplinary matter is made part of an employee personnel file, and the corrective action form was developed by the Department of Human Resource to be utilized by all departments as are the semi-annual Employee Performance Evaluation from which are based upon each employee's job description. (Wright TR 17-19) Further, when an employee completes a disciplinary probation period; it becomes part of their personnel file, and any subsequent review of a disciplinary action would include references to prior matters reflected in the personnel file. (Wright TR 24-25)

GG.     Plaintiff notes that the Corrective Action Report reviewed by Ms. Wright simply reviews the occurrence, as described, or investigated, at the department level; and she makes her decision without any independent judgment as to the quality of  a full vetting of the facts, and circumstances, surrounding the incident performed by the department. (Wright TR 22-23) Further, the semi-annual performance evaluations are also previewed to provide the employees

30

performance as a whole into the consideration during a review. (Wright TR 21-23) Ms. Wright's review is done prior to the employee's being advised of the level of discipline, and such notice to the employee provides notice a potential appeal process as defined by the City Manuel. (Wright TR 26-27)

HH.    Plaintiff notes that the Board of Alderperson of the City of Wentzville had no impute on the establishment of the negotiating principles of the prospective collective bargaining agreement once the Certification Vote in  February, 2009 was successful. (Wright TR 52-53) Ms. Wright selected the negotiating team and occasionally gave them her opinion about what the Board would, or would not consider; but she was only provided the Board periodic updates about the status of the negotiating session with legal counsel in executive sessions and she made all decisions regarding the negotiations for the City. (Wright TR 51-53)

Respectfully Submitted,

/s/Stephen J. Nangle
Stephen J. Nangle, FBN #23618 MO
7120 Oakland Ave.
St. Louis, MO 63117
(314)781-9501 telephone
(314)781-5413 facsimile
sjnangle@sbcglobal.net
Attorney for Plaintiff

**Certificate of Service**

I hereby certify that I have on this 16th day of June, 2011, served a true and correct copy of the foregoing via the United States District Court for the Eastern District of Missouri's CM/ECF electronic filing system upon the following counsel of record:

The Lowenbaum Partnership, LLC
Attn: Mr. Corey L. Franklin
222 South Central Avenue
Suite 901
St. Louis, MO 63105
cfranklin@lowenbaumlaw.com                                    /s/Stephen J. Nangle